UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| JASEN LYNN DUSHANE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:22-cv-00589-JPH-MG |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| NICOLE OSBORN, | ) |
| M. MYERS, | ) |
| L. DAVIS, | ) |
| B VIGIL, | ) |
| HOUGHS, | ) |
| SECCHETTI, | ) |
| S. KALLIS, | ) |
| F MCCARTHY, | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Jasen DuShane is an inmate in federal custody, who was previously incarcerated at FCI Terre Haute. He alleges that Defendants did not provide him with adequate mental health care and retaliated against him for filing grievances and making other complaints. Mr. DuShane brings claims of negligence and intentional infliction of emotional distress against the United States under the Federal Tort Claims Act ("FTCA") and *Bivens* claims against individual Defendants for deliberate indifference in violation of the Eighth Amendment. Defendant United States of America has moved for summary judgment as to some of the claims against it. Dkt. [52]. The individual defendants have moved to dismiss all the claims against them. Dkt. [55]. For

1

the reasons below, the United States' motion for summary judgment, dkt. [52], is **granted in part and denied in part**, and the individual Defendants' motion to dismiss, dkt. [55], is **granted**.

# I.
# Standards of Review

## A. Summary Judgment

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 572 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

### B. Dismissal for Failure to State a Claim

Defendants may move under Federal Rule of Civil Procedure 12(b)(6) to dismiss claims for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A facially plausible claim is one that allows "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, a plausible claim "must allege enough details about the subject-matter of the case to present a story that holds together," *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021), "but it need not supply the specifics required at the summary-judgment stage." *Graham v. Bd. of Educ.*, 8 F.4th 625, 627 (7th Cir. 2021). When ruling on 12(b)(6) motion, the Court "accept[s] the well-pleaded facts in the complaint as true," *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011), and gives the plaintiff "the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Chapman v. Yellow Cab Coop.*,

3

875 F.3d 846, 848 (7th Cir. 2017) (cleaned up).  However, it will not defer to "legal conclusions and conclusory allegations merely reciting the elements of the claim." *McCauley*, 671 F.3d at 616.

## II.
## Factual Background

For purposes of the motion to dismiss, the Court accepts all well-pleaded facts in Mr. DuShane's complaint as true.  *McCauley*, 671 F.3d at 616.

For purposes of the summary judgment motion, the Court views and recites the evidence in the light most favorable to Mr. DuShane and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A. The Parties

At all relevant times to the allegations in the complaint,

- Mr. DuShane was an inmate housed at the Federal Correctional Complex in Terre Haute, Indiana ("FCC Terre Haute").  Dkt. 1 at 1.
- Nicole Osborn, Megan Myers, LaKesha Davis, Bianca Vigil, Gina Sacchetti[1], Erica Hughes[2], and Francesca McCarthy were psychologists who worked for the Bureau of Prisons and treated Mr. DuShane.  Dkt. 56 at 2.
- Steve Kallis was the Warden at FCI Terre Haute.

---

[1] The **clerk is directed** to change the spelling of "Secchetti" to "Sacchetti" in the caption.
[2] The **clerk is directed** to change the spelling of "Houghs" to "Hughes" in the caption.

4

### B. Mr. DuShane's Mental Health Treatment

#### 1. Dr. Vigil

From December 2019 through September 2020, Dr. Vigil was Mr. DuShane's assigned psychologist. Dkt. 1 at 2. During that time, Dr. Vigil and Mr. DuShane had a personal relationship and called one another "friend." *Id.* In September 2020, Dr. Vigil told Mr. DuShane they could no longer call one another "friend," and Mr. DuShane responded by requesting a new doctor because he "was very upset, felt suicidal and needed help." *Id.* He spoke with Dr. Davis, who told Mr. Dushane that Mr. Dushane was the only one who saw the relationship with Dr. Vigil as a casual friendship, and that he had crossed Dr. Vigil's boundaries. *Id.* Despite Mr. DuShane insisting the friendship had been mutual, no other member of the psychology team, including Drs. Osborn, Myers, Sacchetti, and Davis, would counsel him regarding his relationship with Dr. Vigil. *Id.* at 3-4.

On March 18, 2021, Dr. Osborn was assigned as Mr. DuShane's new psychologist. *Id.* at 5. She was immediately "confrontational" and told him "not to cross her boundaries or ask any personal questions." *Id.* at 5-6. Mr. DuShane professed thoughts of injuring himself, "which he had never felt like doing by cutting prior to this," and requested to be seen at least once every two weeks. *Id.* at 6. Dr. Osborn remained Mr. DuShane's psychologist until August 2022, when Dr. McCarthy took over as Mr. DuShane's primary psychologist. *Id.* at 32.

5

In June 2021, Mr. DuShane received a "stalking memo" issued by Dr. Vigil. *Id.* It stated that all psychology staff were part of the memo and Mr. DuShane was ordered to "[l]eave Psychology alone." *Id.* at 11-12.

### 2. Lexington program

In March 2022, Mr. DuShane asked Dr. Osborn if she would help him get into a program at a facility in Lexington. *Id.* Dr. Osborn asked what he would do in exchange for her help, and Mr. DuShane said he would dismiss his lawsuit and grievances. *Id.* The next week, Dr. Osborn agreed to help him get into the program. *Id.* In September, Mr. DuShane learned he was not approved for the program in Lexington. *Id.* at 35. However, he was approved for his second-choice program and was placed on the waitlist. *Id.*

### 3. Mr. DuShane's self-harm and requests to meet with psychology staff

Throughout a period spanning from the beginning of 2021 to the end of 2022, Mr. DuShane would contact or attempt to contact the psychology team, sometimes multiple times per day, requesting to be seen and expressing that he needed help or was in crisis and considering harming himself. *See id.* at 4-5, 6, 7, 10, 25, 29, 31, 33-34. At times, Mr. DuShane would ask the chaplain, officers, or other inmates to contact psychology for him, after the psychology team did not respond to his own requests to be seen. *See id.* at 4-5, 6, 7, 22-23, 29, 30, 31-32, 33-34. Mr. DuShane would frequently not hear back from the psychology team in response to these requests. *See id.* at 4-5, 7, 10, 22-23. During this period, Mr. DuShane self-harmed by cutting himself with a razor on more than twenty occasions. *See id.* at 7, 12, 22-23, 25, 27, 30, 34-

6

38, 40. These occasions included incidents where Mr. DuShane cut himself sixty times in one day, *id.* at 7, over eighty times in one day, *id.* at 27, and once where he cut himself twenty times, passed out from the bleeding, and received stitches in the hospital. *Id.* at 22-23. On one occasion, Mr. DuShane informed Dr. McCarthy that he was going to harm himself when he returned to his housing unit. *Id.* at 39. Dr. McCarthy told him that it was his choice. *Id.* Mr. DuShane was also placed on suicide watch several different times. *Id.* at 7, 10, 16, 23, 26, 32, 35.

### 4. Email to Warden Kallis

In November, Mr. DuShane emailed with Warden Kallis regarding his care. *Id.* at 37. Warden Kallis "mirrored or had Psychology staff respond."[3] *Id.* He also emailed asking to see someone on separate occasions. *Id.*

### C. Mr. DuShane's Tort Claims

Between December 2019 and December 2022, Mr. DuShane filed fourteen tort claims regarding his mental health treatment. Dkt. 52-1 at 2. Those claims cover the following allegations:

1. On December 1, 2021, Mr. DuShane reported to Psychology that he felt unstable because of medication prescribed to him by a non-party. On December 4, he was found in a pool of blood after having cut his arm in an attempted suicide. Dkt. 52-4 at 1 (TRT-NCR-2022-04290).[4]

---

[3] Mr. DuShane does not explain what he means by "mirrored."
[4] Mr. DuShane submitted duplicate claims covering these facts in TRT-NCR-2022-06741 and TRT-NCR-2023-00467. Dkts. 52-10, 52-11.

7

2. On March 23, 2021, Dr. Davis falsified Mr. DuShane's records and reduced his care level. Dkt. 52-5 at 1 (TRT-NCR-2022-06736).[5]

3. On April 7, 2021, Mr. DuShane emailed Dr. Osborn asking to be seen, but she did not respond. Mr. DuShane then harmed himself twelve times. Dkt. 52-6 at 1 (TRT-NCR-2022-06737).

4. On May 6, 2021, Mr. DuShane asked Psychology to help and had officers call them for him. When no one responded, he cut himself. He also asked Dr. Osborn to get him medical attention but she refused. Dkt. 52-7 at 1 (TRT-NCR-2022-06738).

5. On June 4, 2021, Mr. DuShane emailed Psychology and had officers call them, stating he was in crisis and needed to be seen immediately. Drs. Osborn and Myers stated they were busy. After an inmate told Mr. DuShane no one else was at Psychology, he cut himself sixty times. Dkt. 52-8 at 1. (TRT-NCR-2022-06739).

6. Mr. DuShane had an inappropriate relationship with Dr. Vigil. He reported it to Drs. Davis, Myers, Sacchetti, and Osborn to seek counseling. However, between September 2020 and August 12, 2022, they told him to stop talking about the relationship and that it was wrong to speak inappropriately about staff. As a result, he harmed

---

[5] This claim also states Dr. Davis retaliated against Mr. DuShane. However, all retaliation claims were dismissed at screening. Dkt. 24. Accordingly, his claim in TRT-NCR-2022-06740, which states he was issued a stalking memo in retaliation for submitting grievances, is also not issue in this matter. Dkt. 52-9.

himself and was placed on suicide watch many times. Dkt. 52-12 at 1 (TRT-NCR-2023-00468).

7. In March 2022, Dr. Osborn made an agreement with Mr. DuShane that she would get him into a specific program if he withdrew his lawsuit against her and her colleagues. After Mr. DuShane did so, Dr. Osborn did not follow through on her promise before ending her employment at the facility. Dkt. 52-13 at 1 (TRT-NCR-2023-00469).

8. On an unknown date, Mr. DuShane emailed Psychology asking to be seen and had officers call, as well, stating he was in crisis. Drs. Vigil, Myers, and Osborn did not respond and Mr. DuShane cut himself. Dkt. 52-14 at 1 (TRT-NCR-2023-00470).

9. Between March 2021 and August 2022, the Bureau of Prisons ("BOP") forced Mr. DuShane to be seen by Dr. Osborn despite his repeated requests for a new psychologist. During that time, Dr. Osborn was mentally abusive, failed to provide treatment, was demeaning, lied to Mr. DuShane, showed very little skills as a therapist, and failed to follow policy. Dkt. 52-15 at 1 (TRT-NCR-2023-00997).

10. On August 17, 2022, Mr. DuShane emailed Psychology twice stating he was in crisis and needed to be seen. He also sent a note and asked officers to contact them. Drs. Hughes, McCarthy, Sacchetti, and Osborn told one of the officers they were busy and that Mr. DuShane should use his skills. Dkt. 52-16 at 1 (TRT-NCR-2023-00998).

11. On November 22, 2022, Mr. DuShane told Dr. McCarthy he was in crisis and was going to cut himself. She told him that was his choice and sent him to his housing unit. He later emailed her that he was in crisis and going to harm himself, but she did not care. He then cut himself sixty times. Dkt. 52-17 at 1 (TRT-NCR-2023-02424).

BOP mailed final denial letters prior to the filing of this lawsuit in all but two of Mr. DuShane's claims – TRT-NCR-2023-00469 and TRT-NCR-2023-02424, regarding Dr. Osborn's deal to get Mr. DuShane into a program and the events of November 22, 2022, respectively. Dkt. 52-1 at 6.

### D. Claims in this case

Mr. DuShane's complaint is 41 pages long with 255 paragraphs and chronicles events occurring over the course of two years. Dkt. 1. The Court screened the complaint, allowing the following claims to proceed: (1) claims for damages against the Individual Medical Defendants and Warden Kallis based on allegations that they were deliberately indifferent to his serious medical conditions; and (2) FTCA claims for negligence and intentional infliction of emotional distress against the United States. Dkt. 24.

### III. Discussion

The United States has moved for partial summary judgment, arguing that Mr. DuShane did not exhaust available administrative remedies. The

individual defendants have moved to dismiss Mr. DuShane's constitutional claims, arguing that the complaint fails to state a claim pursuant to *Bivens*.[6]

## A. Failure to Exhaust Administrative Remedies

On a motion for summary judgment, "[t]he applicable substantive law will dictate which facts are material." *National Soffit & Escutcheons, Inc., v. Superior Sys., Inc.,* 98 F.3d 262, 265 (7th Cir. 1996) (citing *Anderson v Liberty Lobby, Inc.,* 477 U.S. 242, 247). The substantive law applicable to this motion for summary judgment is the FTCA. 28 U.S.C. § 1346.

The United States cannot be sued without its consent. *See United States v. Sherwood*, 312 U.S. 584, 586 (1941). The FTCA creates a limited waiver of this immunity by permitting suits against the United States for certain personal injuries caused by federal employees. 28 U.S.C. § 1346(b)(1). The FTCA provides:

> An action shall not be instituted upon a claim against the United States for money damages for injury . . . or personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing.

28 U.S.C. § 2675(a).

The Supreme Court has interpreted § 2675(a) as "requir[ing] complete exhaustion of Executive remedies before invocation of the judicial process."

---

[6] The individual defendants additionally argue that Mr. DuShane fails to state a claim for deliberate indifference against Defendants Drs. Vigil, Sacchetti, Hughes, Davis, and Warden Kallis, and that claims against Drs. Vigil and Sacchetti are time-barred. Dkt. 56 at 1-2. The Court does not reach these claims, as it decides this matter on *Bivens* grounds.

11

*McNeil v. United States*, 508 U.S. 106, 112 (1993).  Under 28 U.S.C. § 2401(b), "a claimant must present his claims to the appropriate agency within two years of the date that the claims accrue."  *Augutis v. United States*, 732 F.3d 749, 752 (7th Cir. 2013).

The United States argues that allegations arising from two claims were not properly exhausted: TRT-NCR-2023-00469 and TRT-NCR-2023-02424. Dkt. 53 at 10.  Mr. DuShane concedes the allegations arising from the facts in those two claims were not properly exhausted.  Dkt. 62 at 2.  Consequently, the parties agree those allegations should be dismissed without prejudice. Dkts. 62 at 2, 65 at 3.  Accordingly, the United States is entitled to summary judgment regarding Mr. DuShane's claims relating to:

(1) his agreement with Dr. Osborn to withdraw his lawsuit in exchange for entrance into a program in Lexington; and

(2) the November 22, 2022, incident when Mr. DuShane cut himself sixty times after having told Dr. McCarthy that he was in crisis and going to self-harm.  Dkts. 52-13, 52-17. Those claims are **dismissed without prejudice** for failure to exhaust administrative remedies.[7]

---

[7] The United States also generally argues that allegations which are not encompassed by properly exhausted tort claims are not exhausted, but does not identify any such allegations.  Dkt. 53 at 11. Accordingly, to the extent the United States seeks summary judgment regarding unspecified claims, it is **denied**.

12

### B. Failure to State a *Bivens* Claim

There is no Congressional authority to award damages against federal officials who violate the Constitution while acting under color of federal law. *See Ziglar v. Abbasi*, 582 U.S. 120, 133-34 (2017).

Over fifty years ago, the Supreme Court held in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 397 (1971) that district courts have the implied authority to award damages against federal officials for unreasonable searches and seizures in violation of the Fourth Amendment. That implied authority was subsequently extended twice: first, to actions alleging gender discrimination in federal employment in violation of the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228, 248 (1979); and second, to actions alleging deliberate indifference to a prisoner's serious medical needs in violation of the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14, 17 (1980). But these "three cases—*Bivens, Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Ziglar*, 582 U.S. at 131.

Over the past four decades, the Court has "declined 11 times to imply a similar cause of action for other alleged constitutional violations." *Egbert v. Boule*, 596 U.S. 482, 486 (2022) (listing cases). Furthermore, considering "the Constitution's separation of legislative and judicial power," the Court has "emphasized that recognizing a cause of action under *Bivens* is a 'disfavored judicial activity.'" *Id.* at 491 (*quoting Ziglar*, 582 U.S. at 135).

13

To determine whether a *Bivens* remedy is available to a plaintiff suing a federal actor, the Court makes a two-step inquiry.  First, it asks whether the claim presents a new *Bivens* context by determining whether "the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme Court]."  *Ziglar*, 582 U.S. at 139.  "The Court has identified some differences that qualify as 'meaningful':

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Snowden v. Henning*, 72 F.4th 237, 242 (7th Cir. 2023) (*quoting Abbasi,* 582 U.S. at 140).  Put differently, "a difference is 'meaningful' if it might alter the policy balance that initially justified the causes of action recognized in *Bivens*, *Davis*, and *Carlson*.  If a case involves facts or legal issues that would require reweighing the costs and benefits of a damages remedy against federal officials, then the difference is "meaningful" because we risk further encroachment on the legislative function rather than simply applying controlling Supreme Court precedent."  *Snowden*, 72 F.4th at 244.

Second, if the claim presents a new *Bivens* context, the Court then asks whether there are any special factors that counsel hesitation about extending a damages remedy to the new context.  *Egbert*, 596 U.S. at 492.  In applying the second factor, a district court "faces only one question: whether there is *any*

14

rational reason (even one) to think that *Congress* is better suited to weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 496 (emphasis in original) (quoting *Ziglar*, 582 U.S. at 136).  Additionally, "a court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, 'an alternative remedial structure.'" *Id.* at 493 (quoting *Ziglar*, 582 U.S. at 137).  And this is true even if the individual plaintiff alleges he does not have access to the alternative remedy.  *Id.* at 498 ("whether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts").

### 1. New *Bivens* Context

Mr. DuShane's claims present a new context for *Bivens* remedy purposes.  *Carlson* is the closest possible analogy since that case also involved Eighth Amendment claims of deliberate indifference to serious medical conditions against prison officials.  But the facts here are sufficiently different that permitting the claims against the individual defendants to proceed would be applying *Bivens* in a new context.  Dkt. 67 at 5-9 (comparing in detail the facts in *Carlson* to the facts presented by Mr. DuShane's claims).

*Carlson* involved allegations that prison officials kept the prisoner in the prison facility after the prisoner had an asthmatic attack despite knowing "of the gross inadequacy of medical facilities and staff" at the prison.  *See Carlson*, 446 U.S. at 16 n.1.  Defendants kept the prisoner in the facility against the advice of doctors, "administered contra-indicated drugs which made his attack more severe, attempted to use a respirator known to be inoperative which

15

further impeded his breathing, and delayed for too long a time his transfer to an outside hospital." *Id.* These acts and omissions, the complaint alleged, resulted in the prisoner's death. *Id.* Finally, the complaint in *Carlson* also alleged that the defendants' deliberate indifference "was in part attributable to racial prejudice." *Id.*

Here, the gist of Mr. DuShane's claims is that defendants failed to provide him adequate mental health care over the course of two years. Unlike in *Carlson*, where the underlying factual allegations were relatively simple and straightforward, Mr. DuShane challenges numerous discretionary decisions of multiple psychologists related to treatment of ongoing mental health issues, rather than specific actions taken during a single life-threatening medical emergency. Dkt. 67 at 6-7. This is not sufficiently parallel to *Carlson* to allow for a *Bivens* remedy. *See Snowden*, 72 F.4th at 243 ("a *Bivens* claim may present a new context 'even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized.'") (citation omitted). These differences are meaningful as they might require reweighing the costs and benefits of a damages remedy against federal officials and alter the policy balance that initially justified the causes of action recognized in *Bivens*, *Davis*, and *Carlson*. *Snowden*, 72 F.4th at 244.

### 2. Special Factors Counseling Hesitation

Because Plaintiff's claim presents a new *Bivens* context, the Court now proceeds to the special factors analysis. The FTCA allows for recovery of damages against the United States under certain circumstances where federal

16

agents, including prison officials, commit a state-law tort against an inmate. 28 U.S.C. § 1346(b)(1).  Indeed, Mr. DuShane is proceeding in this action with FTCA claims against the United States.  The Court concludes that Congress has established an alternative remedial structure for claims such as Mr. DuShane's, so expansion of a *Bivens* remedy in this context would be inappropriate.  *Egbert*, 596 U.S. at 493 (citing *Ziglar*, 582 U.S. at 137). Therefore, his constitutional claims against the individual defendants are **dismissed for failure to state a claim**.

## IV.
## Conclusion

The individual defendants' motion to dismiss Mr. DuShane's constitutional claims, dkt. [55], is **GRANTED**.  Defendant United States's motion for partial summary judgement for failure to exhaust, dkt. [52], is **GRANTED as to** the allegations arising out of Mr. DuShane's tort claims in TRT-NCR-2023-00469 and TRT-NCR-2023-02424 and **DENIED in all other aspects**.

The **clerk is directed** to change the spelling of "Secchetti" to "Sacchetti" and "Houghs" to "Hughes" in the caption.

The **clerk is directed** to terminate Defendants Nicole Osborn, M. Myers, L. Davis, B. Vigil, Hughes, Sacchetti, S. Kallis, and F. McCarthy from the caption.

No partial judgment will issue at this time.

The magistrate judge is asked to schedule a telephonic conference to

17

discuss further proceedings.

**SO ORDERED.**

Date: 9/30/2024

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

JASEN LYNN DUSHANE
95629-011
COLEMAN - II USP
COLEMAN II U.S. PENITENTIARY
Inmate Mail/Parcels
P.O. BOX 1034
COLEMAN, FL 33521

All electronically registered counsel

Magistrate Judge Mario Garcia